RICHARD DRISCOLL *vs.* THE NORWICH AND WORCESTER RAILROAD COMPANY.

Second Judicial District, Norwich, October Term, 1894. ANDREWS, C. J., TORRANCE, FENN, HAMERSLEY and HALL, Js.

A railroad company cannot, by a lease of its property, absolve itself from liability for an injury to a stranger, caused by the negligence of the lessee in the operation of the road, unless such exemption is provided for in the lease and is also expressly sanctioned by legislative authority.

Where, however, one railroad company has, with express legislative authority, transferred the full legal ownership of its franchise, as well as its property, to another railroad corporation, the former is then exempt from liability for the negligence of the latter in the management and operation of the road.

In the case at bar the court, after a careful examination of the provisions of the lease or contract in question, *held* that the defendant did not intend to, and did not in fact, part with the legal ownership of its franchise, but purposely retained the same; and therefore that it was not exempt from liability for the negligence of the lessee in causing the plaintiff's injuries. (Two judges dissenting.)

A corporation which has asked and been granted the right to lay out, construct and operate a railroad, is regarded as having promised to pay just damages to a person injured by its want of care in the use of its grant; and it ought not, upon grounds of public policy, to be absolved from such promise except by an Act of the legislature to that effect so distinct and unequivocal as not to be open to mistake or inference.

[Argued October 18th—decided December 1st, 1894.]

ACTION to recover damages for personal injury alleged to have been sustained through the negligence of the defendant; brought to the Superior Court in New London County and heard in damages to the court, *George W. Wheeler, J.;* facts found and judgment rendered for the plaintiff for

$4,500 damages, from which the defendant appealed for alleged errors in the rulings of the court. *No error.*

The case is sufficiently stated in the opinion.

*Jeremiah Halsey* and *W. A. Briscoe*, for the appellant (defendant).

I. It is a general rule of law that a railroad corporation cannot by its own act, without the consent of the legislature absolve itself of its public obligations. Wood's Railway Law, Vol. I., 25. But when the original grantee has, with the consent of the legislature, transferred the franchise with its property, the obligations which grow out of and are consideration for the franchise are transferred to the new owner, who, by the assent of the legislature, and by that assent only, has become the legal owner.

It is then precisely as if the public grant had been made to the new possessor, for if the State through its legislature has assented to the transfer, the original grantee in divesting itself of the right to operate a railroad has divested itself of the obligations and duties which are, for reasons of public policy, incident to and inseparable from the lawful exercise of the right. And this is so whether the transfer be of the fee, or for a limited time. Wood's Railway Law, Vol, III., 1687 ; Pierce on Railroads, 283 ; Paterson's Ry. Acc. Law, §§ 130, 131 ; *Ballou* v. *Farnum*, 9 Allen, 51 ; *Mahoney* v. *Atlantic & St. L. Ry. Co.*, 63 Me., 68 ; *Ditchett* v. *Spuyten Duyvil & P. M. Ry. Co.*, 67 N. Y., 425 ; *Larkin* v. *Willamette Ry. Co.*, 13 Or., 436 ; *Va. Mid.. Ry. Co.* v. *Washington*, 86 Va., 685.

The case of *Braslin* v. *Somerville Horse R. R.*, 145 Mass., 64, sustains the proposition, for the decision of that case rests upon the ground that the legislative assent only ratified the contract so far as the parties had themselves defined it, and that as the lease was only of a portion of the lessor's road and did not purport to transfer the franchise or even the whole of the property, the lessor was not absolved from

the obligation inseparable from the ownership of the franchise.

In a discussion of any authority holding that the lessor remains liable although the legislature has sanctioned the lease, it is to be carefully noted what the lease or contract purports to convey. The lease in the case at bar was of the railway and all the rights, easements, franchises and privileges in connection therewith, with all the property of every nature and description and the right to receive for lessee's own use all tolls, profits, income and rents. The right to fix and determine the number and time of all trains, to fix all rates, employ and control all employees in connection with the business, and to have control of the business done or to be done, in connection with or on the leased property, is granted to the lessee. This right is exclusive. The lessee covenants to do, during the continuance of the lease, every act and thing that may be by law required of or be obligatory upon it or the lessor, in respect to the operation, condition, maintenance and use of the railway and leased property.

The case of *Nelson* v. *Vermont C. R. R. Co.*, 26 Vt., 717, appears from the opinion to have been a case of an unauthorized lease. The reason there assigned for holding the lessor liable—because otherwise it might be able to put its road into the hands of corporations or individuals of no responsibility—has no application to a case where there is legislative assent. In the case at bar both the lessor and lessee are creatures of the General Assembly of this State, and the lessee had been already vested with power to construct and operate a railroad.

There remains to be noticed a limited class of cases holding that the lessor cannot, in the absence of express legislative exemption, be discharged of its public obligations, on the ground that while the franchise exists the duties owed by it exist. We respectfully submit that the reason for such a decision has no applicability where the franchise itself is transferred with legislative sanction, so that the benefit of it to the original grantee is lost or suspended during the operation of the contract. The true rule, we submit, is as laid

down by the authorities above cited, and in no event goes further than is expressed by the court in *Nugent* v. *B.*, *C.* & *M. R. R.*, 80 Me., at page 76 : — " In other words an authorized lease, without an exemption clause, absolves the lessor from the torts of the lessee resulting from the negligent operation and handling of its trains and the general management of the leased road, over which the lessor could have no control. But for an injury resulting from the negligent omission of some duty owed to the public, such as the proper construction of its road, station houses, etc., the charter company cannot in the absence of statutory exemption, discharge itself of legal responsibility." *St. L.*, *W.* & *W. Ry. Co.* v. *Carl*, 28 Kan., 622. Such a rule recognizes the fact that there is no privity between the party injured by the negligent operation of the road, and the corporation which by authority of the legislature has transferred to another the exclusive control and management of the trains and of all persons employed in their operation.

II. If the law as to the non-liability of the lessor is as we have above claimed it to be, there remains to be considered whether there is anything in the provisions of this particular lease which takes it out of the operation of the general rule. It will be claimed that by the terms of the lease the lessor retains such control of the finances of the road, and such control in the selection of the managing agent that the lessee is merely the general agent of the lessor, and that further, the provisions of the lease respecting indemnity to the lessor for all defaults of the lessee indicate that the parties did not contemplate any exemption of the lessor's liability.

The securing of indemnity, we submit, does not raise an obligation or liability where none otherwise exists. Nor is it any indication that the lessor and lessee intended that the lessor should remain liable. The best indication of their intention is to be found in the covenant of the lessee to do every act and thing that may be by law required of or obligatory upon it or the lessor in respect to the operation, condition, maintenance and use of the railway and demised premises.

In conclusion, it is respectfully submitted that a fair and just construction of this lease transfers to the lessee, not as an agent but as a legal owner for the time being, the entire railroad and property of the lessor with the exclusive right to operate the railroad and to control its employees without let or hindrance by the lessor. Such transfer of property and franchise was approved by the General Assembly of the State, and as a legal effect of such approval the lessor is exempt from all liability for the negligent operation of the road by the lessee during the continuance of the lease.

*William H. Shields* and *Donald G. Perkins*, for the appellee (plaintiff).

I. The defendant claims that it is not responsible for the plaintiff's injury, because it was caused by the negligence of the servants of a corporation to which it had leased its road under an agreement ratified after its execution by Chap. LXXVI., Public Acts of 1869. It is conceded that except for the ratification of the lease by the statute, the defendant would be liable, notwithstanding the lease. A lease without statutory authority is *ultra vires*, and also void as against public policy. Redfield's Law of Railways (5th Ed.), 616; Pierce on Railroads, p. 283; Wood's Railway Law, p. 486, *n.; Thomas* v. *West Jersey R. Co.*, 101 U. S., 71; *Penn. R. Co.* v. *St. L. R. Co.*, 118 id., 290; *Abbott* v. *Johnstone R. Co.*, 80 N. Y., 27; *Davis* v. *Old Colony*, 131 Mass., 269; *Braslin* v. *Somerville H. R. Co.*, 145 id., 67, and cases cited.

II. A railroad company cannot, on the ground of public policy, release itself from liability for the negligent operation of its road by a lessee, except under specific statutory provision authorizing such exemption. See authorities cited, *ante ;* also *Washington Railroad Co.* v. *Brown*, 17 Wall., 445; *Nelson* v. *Vermont R. Co.*, 26 Vt., 717; *Wabash R. Co.* v. *Peyton*, 106 Ill., 534; *Balsley* v. *St. L. R. Co.*, 119 id., 68; *Penn. R. Co.* v. *Ellett*, 132 id., 654; *Langley* v. *B. & M. R Co.*, 10 Gray, 103; *Ingersoll* v. *Stockbridge R. Co.*, 8 Allen, 438;

*Daniels* v. *Hart et al., Trustees,* 118 Mass., 543 ; *Davis* v. *Prov. & W. R. Co.,* 121 id., 134 ; *Quested* v. *Newburyport, etc. R. Co.,* 127 id., 204 ; *Braslin* v. *Somerville H. R. Co.,* 145 id., 64 ; *Hamden* v. *New Haven & N. Co.,* 27 Conn., 165 ; note to *Ohio R. Co.* v. *Dunbar,* 71 Am. Dec., 296 ; *Phila. R. Co.* v. *Hahn* (Penn case), 12 Atl. Rep., 479. The case of *Braslin* v. *Somerville* is directly in point with the case at bar on the absence of any specific statutory exemption from liability, and also on the similarity of the leases, and the provision in each that the lessee indemnify the lessor from all damage by reason of its liability.

The statute does not either expressly or impliedly release the lessor from its liability to the public for injuries caused by the lessee in the operation of the road. The statute allows three forms of contract: 1. Any contract in relation to its business or property not forbidden by law. 2. A lease of its road and franchise. 3. A contract for the operation of its road in connection with such connecting road. Surely the grant of the naked power to contract in relation to its business and property, and to operate its road in connection with a connecting road, cannot be said to include by implication an exemption from liability for the negligent operation of the road, under whatever contract is made. *Braslin* v. *Somerville H. R. Co.,* 145 Mass., 68.

III. Viewed in the light of the principles of law established by the foregoing authorities the lease in question does not exonerate the defendant for negligence in the operation of its road. The lessee was the agent of the defendant in the operation and management of the road, and the defendant is responsible for the negligent acts of the lessee or persons employed by it.

IV. On the facts it cannot be claimed successfully that the lessee stands in the relation, not of an agent, but a contractor to do a particular work entirely independent of the employer, and so is not liable. But even though it were held that the lessee was a contractor, yet on principle the defendant is liable for the injury in this case. Wood's Master and Servant, § 316, and cases there commented upon

and cited.   Cooley on Torts, p. 644, and note.   The injury
consisted in the employees of the lessee allowing a heavy car
under rapid propulsion, a dangerous agency, to escape from
their control and run off of the layout within which they
were bound to confine it, and run upon private property, and
by collision injure the plaintiff, who was rightfully there
attending to his own affairs.   The injury resulted because
the lessee did improperly the very thing it was employed
to do.

" Whoever for his own use brings on his land and collects
and keeps there anything likely to do mischief if it escapes,
must keep it at his peril."   *Fletcher* v. *Rylands*, L. R., 1 Ex.,
265 ;   *Hole* v. *S. & S. R. Co.*, 6 H. & N., 488 ;   *Brewer* v. *Peate*,
L. R., 1 Q. B. D., 327 ;   *Gray* v. *Pullen*, 5 B. & S., 970 ;
*Randleson* v. *Murray*, 8 Ad. & El., 109 ;   *Laugher* v. *Pointer*,
5 B. & C., 547 ;   *Shipley* v. *Fifty Associates*, 106 Mass., 198 ;
*Gorham* v. *Gross*, 125 id., 238 ;   *Sturgis* v. *T. E. Society*, 130
id., 415 ;   *Woodman* v. *M. R. Co.*, 149 id., 340 ;   *Blessington* v.
*Boston*, 153 id., 412 ;   *Veazie* v. *Penobscot R. Co.*, 49 Me., 119 ;·
*Lawrence* v. *Shipman*, 39 Conn., 589 ;   *Norwalk G. Co.* v.
*Norwalk*, 63 id., 526 ;   *Homan* v. *Stanley*, 66 Penna., 464.

V. As a matter of convenience, a case brought by this
plaintiff at a later date against the lessee for the same injury
was tried with this case, and a judgment for the same amount
rendered at the same time in both cases.

The principal and agent are both liable for injuries caused
by the negligent acts of the agent in the course of his em-
ployment.   Both can be sued and a judgment recovered
against each, but only one judgment can be satisfied.   Bishop
on Non-Contract Law, §§ 522, 622, *et seq.*   Cooley on Torts
(2d Ed.), p. 163, *et seq.*   1 Swift's Dig. (s. p.), 67, 69.
*Sheldon* v. *Kibbe*, 3 Conn., 214;   *Ayer* v. *Ashmead*, 31 id.,
453 ;   *Atwater* v. *Tupper*, 45 id., 146.

ANDREWS, C. J.   The defendant is a corporation chartered
by the States of Connecticut and Massachusetts, for the pur-
pose of constructing and operating a railroad from Worces-
ter, in Massachusetts, to Norwich, in Connecticut, and thence

to tide-water on Long Island Sound. The complaint alleges that the defendant, through its agents and servants, on the 28th day of January, 1893, then having in their possession and control a certain engine and cars, the property of the defendant, and then running and moving the same upon the said railroad in the city of Norwich, in the exercise of their franchise and in operating their railroad, so negligently and carelessly managed the same that the plaintiff was thereby greatly cut, bruised, wrenched and wounded and was permanently disabled, to his great injury. The defendant suffered a default, and there was a hearing in damages. The court assessed damages to the plaintiff in the sum of $4,500, and the defendant appealed.

The finding of facts so far as it bears on the questions raised on appeal, is as follows:—

"1. On February 9th, 1869, the defendant leased its railroad to the Boston, Hartford and Erie Railroad Company, by indenture, a copy of which marked Exhibit "A" is hereto annexed and made a part of this finding. (This indenture is given in full in the foot-notes.)

---

### EXHIBIT "A."

THIS INDENTURE, made this ninth day of February, one thousand eight hundred and sixty-nine, between the Norwich and Worcester Railroad Company, a company existing by virtue of the laws of the States of Connecticut and Massachusetts, of the first part, and the Boston, Hartford and Erie Railroad Company, a corporation existing by virtue of the laws of Connecticut, Rhode Island, New York and Massachusetts, of the second part, Witnesseth:

Whereas, it is believed to be for the advantage of the public, and of both parties hereto, that the railway and steamboat property of the party of the first part should be managed and operated for the term of this lease by the party of the second part: Now, therefore, these presents witness, that the parties hereto, in consideration of the premises, and of the several provisions hereinafter contained, for the benefit of each respectively, do hereby mutually covenant, promise, contract, and agree, to and with each other as follows, to wit:—

First: Said party of the first part hath demised, leased, and rented, and doth by these presents demise, lease, and rent, for the term of one hundred years, from and after the first day of February, A. D. eighteen hundred and sixty-nine (1869), unto the said party of the second part, and its successors, all and singular, the railway of the said party of the first part, extending

" 2. The New York and New England Railroad Company afterwards succeeded to all the property rights, and fran-

from a point in the city of Worcester in Massachusetts, to Allyn's Point, so called, some miles southerly of the city of Norwich in Connecticut, with its railway in said city of Norwich, together with all the lands on which said railway is or shall be located within said terminal points, and which are connected with the uses of said railway, and all the rights, easements, franchises, and privileges in connection therewith, or which are appurtenant thereto, and all the turnouts, branch tracks, depot grounds, stations, depots, superstructures, erections, and fixtures used therewith and belonging thereto, and the lands and premises on which the same are situate and standing, now used and belonging, and to be used or belonging, or in any wise appertaining to said railroad, together with all and singular the real estate, tenements, hereditaments, and appurtenances of the party of the first part; together with and also the right to ask, demand, and receive, for their own use and benefit, of all the tolls, profits, income, and rent, and charges which may or can be legally demanded or received for the transportation of persons or property upon or over the said railroad, or any part thereof, or resulting in any wise from the operation and working of said railroad, or the use and occupation of said demised property, or any part thereof, together with the use of all the personal property of said party of the first part, used, or to be used, upon or in connection with said leased railroad, however the same may, can, or should be described, and wherever situate and being; with the dividends and profits of the steamboat stock owned by said party of the first part, and excepting the books of record, and accounts and papers pertaining to the business of said party of the first part, and the shares in the capital stock of said company. Said party of the second part, or any person by its board of directors from time to time designated, shall have the right to vote on said shares of steamboat stock as the agent and attorney of said party of the first part; and said party of the first part will, on request, execute and deliver to such attorney so designated proper proxy to enable such attorney to vote in any meeting of said steamboat company in manner as aforesaid; and said party of the second part shall so cause said votes on said shares to be cast as will best insure the prosperity of said steamboat interest, and so that the equipment of the line shall be kept up to meet any present or future demand of the business done, or that may be done in connection with the leased railroad and property; yielding and paying rent therefor to the treasurer or said party of the first part, annually, ten (10) per cent on the capital stock of said company, party of the first part, the same being free from all taxes, assessments, and charges of every name and nature,—said annual rent being the sum of two hundred thirty-five thousand four hundred and thirty ($235,430) dollars, to be paid in lawful money of the United States, semi-annually, on the first days of July and January in each and every year, in equal half-yearly payments of one hundred seventeen thousand seven hundred and fifteen ($117,715) dollars, from and after January, 1869,—said payment to be made at the office of the treasurer of said party of the first part,.and also all taxes,

Driscoll *v.* Nor. and Wor. R. R. Co.

chises of the Boston, Hartford and Erie Railroad Company, and on April 26th, 1886, assumed the said lease in all its

rates, charges, and assessments, ordinary and extraordinary, which may be imposed or assessed in any way on said property herein and hereby leased, and on said rental or dividend; —

Provided always, nevertheless, that if the rent above reserved, or any part thereof, shall be behind or remain unpaid for thirty (30) days from and after any day of payment, whenever the same ought to be paid as aforesaid, and written demand to pay the same has been made; or if default shall be made for the space of thirty (30) days in any of the covenants herein contained to be paid, kept, and performed for the benefit of said party of the first part, and written notice to pay, or keep, or perform the same has been made, then and from thenceforth it shall be and may be lawful for the said party of the first part, its successors and assigns, into and upon the said demised premises and every part thereof wholly to re-enter, and remove all persons therefrom without process of law, and the same to have again, repossess, and enjoy as in the first and former estate, anything herein contained to the contrary notwithstanding; and this indenture, and all the provisions therein contained, may, at the option of said party of the first part, thereupon be declared to be and the same shall thenceforth be forfeited, and shall cease and determine, except so far as to enable the party of the first part to collect the rent due up to the time, and the proportion of rent accruing to that time, from the time the party of the first part shall thus re-enter upon, repossess, and enjoy the said demised property upon such forfeiture; and also except so far as any right for damages may have accrued or existed by reason of the non-performance of any of the covenants of this indenture:

And the said party of the second part, for itself, its successors and assigns, does covenant and agree to and with the said party of the first part, its successors and assigns, that it, the said party of the second part, its successors and assigns, shall and will yearly and every year during the said term hereby granted, well and truly pay or cause to be paid unto the said party of the first part, its successors or assigns, in the manner as aforesaid, the said rent herein reserved, on the days and in the manner herein limited and prescribed for the payment thereof, without any deduction, fraud, or delay, according to the true intent and meaning of these presents.

Second: The said party of the second part and its successors will pay, bear, and discharge all taxes, rates, charges, assessments, and levies, ordinary and extraordinary, of every kind, which may be levied, charged, assessed, or imposed on all or any part of the demised property and the capital stock of said company, whether the same be imposed by the Federal or State governments, or by any municipal or other authority; and also all taxes or assessments, by whomsoever lawfully imposed, upon any business or traffic transacted by it upon or over the said leased railway, and all income taxes on the business or profits; and in all such cases protect and save said party of the first part harmless of, from, and against any

terms, except that by agreement of the parties in interest the annual rental to be paid was reduced from ten per cent to eight per cent.

and all cost and expense on account of the same, so that the said party of the first part shall receive a clear annual revenue of two hundred thirty-five thousand four hundred and thirty (235,430) dollars from said demised property, without any diminution or reservation from or by reason of any of the causes aforesaid; and also that in case, by law, the taxes now imposed on the real property shall be lifted or laid on the capital stock or franchise of the corporation party of the first part, so far as the said real estate is relieved, and the capital stock thereupon taxed, the amount of such tax or imposition shall be paid by said party of the second part to said party of the first part.

Said party of the second part agrees that it will at all times keep the buildings and other personal estate leased, and which is now insured, as fully insured as the same now is, for the benefit of said party of the first part; and that any building or other property insured and destroyed by fire shall be at once rebuilt, replaced, or renewed, and a like or greater amount shall be kept insured on any new building or improvements, or renewals, or new purchases, or new constructions, or property put in place and stead of any had under this·lease, and destroyed as aforesaid; and it is mutually agreed that any and all sums had upon any policy of insurance upon any property insured as aforesaid, or on any property under any policy now held by said party of the first part on said property, shall be received by said party of the second part, and by it be used in renewals or substitutions of like property to that insured under such policy or policies of insurance.

Said party of the second part agrees that it will at all times keep and maintain said railway, in its road-bed, bridges, superstructures, buildings, grounds, fences, and in each and all things pertaining to the same, and in everything pertaining to the rights and uses of the public connected therewith, in as good order, repair, and condition as when received, and replace and keep up all such of the fixtures, rolling-stock, and furniture supplies and other property, as shall be shown by an inventory to be taken and appended to this indenture, as shall or may wear out, or be destroyed by use, fire, flood, accident, design, or removal; so that at all times there shall be upon and connected with said leased railway all things evidenced by such inventory in as good condition and to as full extent and amount as shown by said inventory; and such new property or renewals as aforesaid shall be and stand the estate of said party of the first part in the place and stead of any of like property worn out, destroyed, or removed. And said party of the second part shall at all times during the continuance of this indenture maintain and keep said railway and other estate in manner as aforesaid, and shall, at the expiration or other sooner determination of the term hereby granted, surrender said railroad and other property so to be had, and renewals or substitutions of and for the same, in as good order, state and condition as when received; and shall also deliver of said

" 3. At the time said lease was made no statute authorized the same, but the same was ratified by the provisions of

personal estate an amount of like description as that found in said schedule, and of like value as that received, to be determined as hereinafter provided; and said party of the second part does stipulate and agree that the repair-shops herein leased, situate in Norwich, shall be maintained there, and shall not be removed. An inventory and appraisal of the personal property had and to be kept up and returned in kind as aforesaid shall at once be made by P. St. M. Andrews and Wm. M. Parker; and if they do not agree upon the same, any person by them agreed upon; and if they do not agree, any person agreed upon by the directors of the party of the first and second part shall act with them, and shall make a board of inventory and appraisal; and if said Andrews and Parker shall agree, or, failing to agree, a written inventory and appraisal of said personal property, signed by either two of said board, shall be final and binding on the parties hereto, as to the personal property held under this indenture, and the value thereof, and such papers shall be appended hereto, the same being made in duplicate and appended to the contract held by the parties hereto severally, and shall be the basis and proof of the kinds, value, and amounts to be at all times kept and maintained by the party of the second part upon or in connection with said leased railway and property. Said appraisal shall be made upon a basis of lawful money; and at all times when any appraisals are to be had under these provisions during the continuance of and at the termination of this indenture, the lawful money of the United States shall be used. At the termination of this indenture, if it shall be found on appraisal that the personal estate returned by the second to the first party shall be less in value than the amount received under this indenture and said appraisal, said party of the second part shall pay the difference to said party of the first part in such manner as to make the payment equal to its value in lawful money; and if the property in hand and to be returned shall be of greater value than the amount received as aforesaid, said party of the first part may elect to choose and retain so much and such as it shall elect, to the amount due it, or may take the whole at the appraisal, and pay for the same in such manner as to make the balance to be paid equal to lawful money as aforesaid.

It is mutually agreed that the general charge and determination of what expenditures shall be made to keep the railway bridges, buildings, equipment, and supplies of the party of the first part equal to the present condition of the same, and what additions thereto may be required by the increased business of the road, shall be confided to a managing agent, to be agreed upon by the board of directors of the two companies; and if they do not agree, to be appointed by the arbitrators herein mentioned; and if, in the opinion of either board of directors, the opinion and determination of said managing agent is not satisfactory as to any of said matters, his decision as to the same shall be submitted to said arbitrators, whose decision thereon shall be final; and said manager is to act in accord-

chapter LXXVI., Public Acts of 1869, approved July 8th, 1869, page 17, and subsequently a modification thereof be-

---

ance therewith. All expenditures authorized by said manager under the foregoing provisions are, upon his certificate, to be paid by the treasurer of the party of the first part from the funds he may receive from the income of the road and property. Said manager shall be removed from office on the request of either party, and a new one appointed; and he shall make no order for expenditure exceeding five thousand (5000) dollars, without the assent of some proper officer appointed by the directors of the party of the second part, except after arbitration had as aforesaid.

Said party of the second part shall and will, at all times during the continuance of this indenture, indemnify and keep indemnified and harmless the party of the first part from all costs, suits, expenses, and damages which the party of the first part may sustain or incur by reason of any default or failure of the party of the second part, its grantees or its agents, in the operative management or use of the said railway and demised premises, or any part thereof, or in the use of any engine, car, article or machinery of any kind in regard to which any claim for violation of any patent rights may be made, or in their omission to do and perform any act or thing which may be required by law to be performed by the party of the first part.

Said party of the second part will continue to do, during the continuance of this indenture, every act and thing that may be by law required of or be obligatory upon it or said party of the first part in respect to the operation, condition, maintenance and use of said railway and property hereby demised, and every part thereof, including the keeping and rendition of all accounts and reports that shall be by law required; either making and returning the same to the authorities of the State, or furnishing all the data in its possession to enable the party of the first part to make the same; and in all cases as the law shall require in the premises.

Whereas said party of the first part has a contract with the New London Northern Railroad Company for the use of its track from Norwich to New London, and of certain property at New London, which contract is of date of                        and to which reference is hereby made for the terms and conditions of the same, said party of the first part does hereby agree to sell, assign, and transfer, and does hereby sell, assign, and transfer the same to said party of the second part, with all the rights, grants, and privileges therein contained and made to said party of the first part; and said party of the second part does assume said contract in the place and stead of said party of the first part, and agrees to keep and fulfil all things therein contained to be done, kept, and performed by said party of the first part; said assignment subject to be avoided by the termination of this lease for any of the causes set forth herein.

And whereas said rights of said party of the first part terminate under said contract on the     day of     187 , it is agreed by said party of the first part, that, if said party of the second part cannot renew said contract, or make a like one with said New London Northern Railroad Company, on

tween the defendant company and the New York and New England Railroad Company was provided for by Resolution

terms satisfactory to said party of the second part, within eighteen months from date, it may demand of the party of the first part to extend its railway from Norwich to New London on the side of said New London Northern Railroad, under its present or any further powers; and said party of the first part agrees so to do, and to make as good a way as now exists by the present New London Railroad, and also to procure as good and ample steamboat wharfage and buildings therefor at New London, and connected with said new railway, as said party of the first part now occupies at said New London, and to have good title to all the same, and ready for use, at the termination of said contract with said New London Northern Railroad Company; and then, and in such case, at said termination of said contract, said new railroad and steamboat wharf and buildings shall be included under this indenture upon the same term of time and on the same conditions as the railway and buildings are leased aforesaid; and an additional sum in rent for the same shall be paid, equal to ten per cent. on the cost; and said party of the first part may issue of its capital stock to cover the expenditure. *Provided*, however, that it shall be at the option of the party of the first part by itself to renew its lease, or make a new one, with equal rights to the present lease, with the New London Northern Railroad Company, and transfer such renewal to said party of the second part, for the term of time this lease is to run; and in that case the party of the second part are to pay a rent on the same to the party of the first part equal to ten per cent. on what would be the cost of the new railway wharf and buildings, which should furnish accommodations like those had under the lease, if the party of the first part had been obliged to build them; and for any allowance which should be made for any uses the New London Northern Railroad Company shall have reserved under such new lease, consideration is to be had in favor of said party of the second part; and if the parties hereto do not agree as to the amount to be paid under such renewal of lease, it shall be left to arbitration, as is provided for differences of opinion under this indenture.

And it is further mutually agreed by and between the parties hereto, that, in case said party of the first part shall neglect or refuse to build said new road to New London when requested as provided aforesaid, or to procure a lease of the present road and appurtenances, and assign the said lease to said party of the second part as provided aforesaid, the new road may be built and the necessary wharves and so forth, obtained by the party of the second part under any rights existing in said party of the first part, which said rights said party of the first part agrees to exercise for the party of the second part in the premises; and when built and obtained, said party of the second part may use the same for the term of this lease, paying all costs attending the same, and saving the party of the first part from all costs, charges, and liabilities of every name and nature attendant or consequent upon the building or using such new road and appurtenances. But this stipulation, or the building such new road under the same, shall

of the General Assembly, approved July 3d, 1874, Private Acts of 1874, page 84.

not be construed or held to release the party of the first part from its obligations under this indenture to build such new road, or to lease the present road, if called upon to do so, under the provisions herein contained.

Said party of the second part is to assume and pay, and does hereby assume and agree to pay, all the indebtedness and liabilities of said party of the first part, bonded and floating, as hereinafter provided: and it is mutually agreed that all sums due or to be due, and all amounts that shall accrue from date to said party of the first part from any sources of income, as well as that already accrued up to the commencement of possession by the party of the second part under this indenture, shall be applied in liquidation of such floating debt; and any securities of stock, other than the steamboat stock aforesaid, of the corporation party of the first part, on hand or out as collateral, with any sinking fund, shall stand and be held for payment of said bonded debt. Said indebtedness of said party of the first part is to be provided for and paid in manner following: The floating debt is to be paid by the party of the second part, from any funds in the hands of the treasurer, if sufficient, as it falls due, or provide for the same from its own funds, in case of lack in the hands of the treasurer.

The interest on the bonded and mortgage debt and on the Massachusetts loan is to be paid by the party of the second part as aforesaid, when and as the same shall fall due. When the principal sum shall fall due on the Massachusetts loan, the sinking-fund set over against the same shall be used in its payment; and if more than sufficient, the balance shall belong to the party of the first part; and if not enough, the balance shall be paid by the sale of stock as herein provided. When any principal sum, due by bond or mortgage note of said party of the first part, shall fall due, the party of the first part shall issue and sell such an amount of shares of its capital stock as may be necessary to pay the same; and for every share so issued said party of the second part shall pay, as additional rent for the demised railroad and property, the sum of ten (10) dollars, to wit: five (5) dollars in each July and January thereafter, in manner and form as rent is herein reserved to be paid.

And whereas there are outstanding ninety-four shares of the common stock of the company, party of the first part, never surrendered, and which, if returned, is entitled to the issue of one hundred and seventeen (117) shares in its stead, on the payment of two thousand three hundred ($2,300) dollars,—said party of the second part agrees, that, if said ninety-four shares are surrendered, and said two thousand three hundred ($2,300) dollars are paid to said party of the second part, to be expended in betterments on the demised property, said party of the first part may issue said one hundred and seventeen (117) shares; and it will pay an additional semi-annual sum of five hundred and eighty-five ($585) dollars, on each July and January thereafter, as rent.

And whereas said party of the first part has contracts for business and other matters and things with sundry railroad and steamboat companies,

" 4. Both the New York and New England Railroad Company and the Boston, Hartford and Erie Railroad Company,

and with persons and companies and corporations, it is agreed by and between the parties hereto, that all such contracts are to be, and that they are hereby, assumed by said party of the second part, and that the said party of the second part will do, keep, and perform all matters and things by said party of the first part to be done, kept, and performed by such contracts and agreements, and save said party of the first part from all costs and charges and expenses on account of the same: and it is mutually agreed that said party of the second part shall have and receive all the payments, benefits, rights, or other things to be received or had by said party of the first part under or by virtue of any such contract or agreements.

If this indenture of lease shall become for any cause void or vacated or annulled, then all contracts herein and hereby agreed to be assigned to the party of the second part, and all contracts it may make in renewal, shall revert and become the property of the party of the first part; and said party of the second part shall, on request, make any such transfer or assignment as shall be proper and lawful to vest the same in said party of the first part. And when any contracts are made with the steamboat company herein referred to, they shall be made on terms not less favorable to said steamboat company than the present contract between such steamboat company and the party of the first part. Any existing contract with the Boston and Albany Railroad Company may be canceled or modified by the consent of said railroad company.

It is mutually stipulated, that in case the parties hereto shall agree that any portion of the leased real estate which shall not be needed in the operation of the railway, or that if a change of location of track and station at Worcester or at any other place will be best for the public and the parties hereto, said party of the first part may sell and convey such portion of said real estate, agreed upon as aforesaid, and invest the proceeds in a fund to be known as the improvement fund; and such fund may be applied to the purchase of any new or changed line, or grounds and buildings, in the place and stead of those sold; and if, by such change, or purchase or construction of new buildings, a greater sum be required than is obtained from the sale of property as aforesaid, said party of the first part is to provide for and pay the same by issue of new stock or otherwise; and said party of the second part shall pay ten per cent per annum on the amount of such expenditure, over and above the amount of funds in the improvement fund; and the new track, grounds, and buildings shall be included under this indenture of lease for the same time and upon the same terms and conditions that the railway is herein leased.

Said party of the first part further agrees, that, during the continuance of the agreements herein, the party of the first part will maintain its organization and existence as a body corporate in due form of law; will elect a lawful board of directors, a president, secretary or clerk, and a treasurer; and such treasurer shall be satisfactory to said party of the second part, and shall employ proper and necessary clerks or assistants; and that said

as well as the defendant company, are corporations created
by the General Assembly of the State of Connecticut.

party of the first part will do and perform all such acts, matters and things,
on request of the party of the second part, lawful and consistent with the
rights of the party of the first part and its public duty, as shall be proper
and necessary to the due preservation and protection of all the prop-
erty, estates, rights, franchises, and interests herein let and demised to
said party of the second part, and to carry into effect the true intent and
meaning of this agreement; and, in default thereof, that the same may be
done by said party of the second part, so far as it can lawfully do the same,
or by its agents, successors, or assigns, in the name and as the act of said
party of the first part.

Said party of the first part agrees to do all lawful corporate acts and
things upon request of said party of the second part, to enable it to make
any additions to lands for the use of the demised railway, or to enable said
party of the second part to improve said railway in its curves, cuttings,
embankments, or lines of sight, or depot, or other grounds; and said party
of the second part may improve said railway in such respects, with the
assent of said party of the first part, and all at its own cost and expense,
under the advice, assent, and control of the General Railroad Commission
of Connecticut, or the laws of the State in which the proposed improve-
ments shall be located.

It is mutually stipulated between said parties, that, if any other or fur-
ther acts need be done, or any other or further instrument, assignment, or
paper shall need be made or executed, signed, sealed, or delivered by said
party of the first part to insure to said party of the second part the use,
enjoyment, income, or possession of anything in this instrument agreed to
be delivered to or had by said party of the second part, not inconsistent
with the terms of the agreement, the act shall be done and instrument
made; and so, in like manner, if any act shall need be done or instrument
made by the party of the second part, to insure to said party of the first
part anything in this instrument stipulated by the party of the second part,
not inconsistent with, but under the terms of this contract, the act shall
be done and instrument made on request.

The business in connection with the leased property shall be managed
and conducted as follows, to wit: The party of the second part shall fix and
determine the number and time of all trains to run on the leased railway,
to fix all rates of passenger and freight transportation, employ and control
all employees in connection with the business, and have control of the busi-
ness done, or to be done, in connection with or on the leased property.
The party of the second part agrees, that, in operating said leased railway,
it will furnish the public at least as good facilities, both in its passenger and
freight department, as is now enjoyed by the public or private persons upon
or in connection with the leased estate, and especially will furnish to the
cities of Worcester and Norwich and the towns on the line of the road be-
tween said two cities, facilities for the transportation of passengers and
freight, equal to or greater than they now enjoy upon the road.  It shall

"5. At the time of the injury hereafter referred to, the defendant road was operated under the aforesaid lease by the New York and New England Railroad Company.

have a person in charge of the railroad and property, to be called the Managing Agent, who shall be a person satisfactory to the party of the first part. A true account shall be kept of all expenditures, earnings, and receipts of the business of said leased estates, substantially in form and manner the same is now kept by the party of the first part; and such receipts shall be collected by said treasurer, to be chosen as above provided, of the agents or persons who may receive any of the same, or by himself, who shall, of his own motion, pay such expenditures as he knows correct, and such others as shall be ordered or approved by the managing agent; and shall, at the close of each month, make up his account, and render the same to said managing agent, and, on request, to either party hereto; and, after the payment of the monthly dues, shall make proper investment or deposit in bank to the credit of a rent fund; and, on the first day of June and of December in each year, shall make up his semi-annual account, and statement of receipts and expenditures, and furnish it to the parties hereto; and of the balance on the first day of July and January in each year, pay to himself as treasurer, for the use and benefit of said party of the first part, such sum as shall then be due as rent under this indenture and the balance, if any, he shall pay over to the treasurer of the company, party of the second part. And if, on said first days of June and December, said treasurer shall find he has not sufficient funds in hand to pay the rent to accrue on the next pay-day, he shall give notice thereof in writing to the party of the second part, and it shall supply the deficiency to said treasurer before such pay-day shall arrive. The books, accounts, bills, and vouchers of said managing agent and said treasurer shall be at all times open to the examination of any person authorized by a vote of the directors of either corporation party hereto.

In determining the amount of moneys to be held and retained by the treasurer, of the receipts and collections by him made, at his monthly or other oftener or other settlements, it is agreed that he shall collect and hold: First, all receipts and earnings of the railway and leased property had from its own separate and proper business. Second, its proper proportion of all moneys earned and received by or from or under any contract now existing or that may be made with any railroad or steamboat company, or other person or corporation. Third, from any business in connection with the party of the second part from its railroad leading from Putnam and Southbridge to Boston. The treasurer shall pay over to the party of the second part, and it shall be entitled to have and retain, such percentage as it would have received for business under the memorandum for a contract lately agreed between a committee of each company, and the balance of the joint business to be divided between the steamboat company and the treasurer, as was contemplated; and such memorandum shall be annexed hereto to show the division to be made. Fourth, all other earnings and receipts to be had and held by the treasurer to the semi-annual settlements.

"6. The defendant has, since the execution of said lease, maintained its organization, elected its officers, including a board of directors, a president, secretary, and a treasurer; made its reports to the Railroad Commissioners of this State as required by law, and has acquired land needed by it and used for the purposes of its railroad.

"7. The defendant through its treasurer, during the continuance of said lease, collected and received all receipts from the management and operation of the defendant railroad, deposited them in bank to defendant's credit, and

---

The proper expenses attending the office of treasurer, such as salary, clerk-hire, etc., together with the proper expenses of keeping up the organization of the corporation party of the first part, and all expenses attendant upon any arbitration under this indenture, is to be paid by the party of the second part.

It is mutually agreed, that, in case any difference of opinion shall arise between the parties hereto, as to the lawful and proper construction of this indenture, or of the duty of either party under the same, and either party shall, in writing, state its claim, and the same shall be denied, refused, or postponed by the other party, either party may thereupon demand that the matter be submitted at once to arbitration, and it shall be done; and thereupon the matter shall be submitted to the arbitration and award of Francis H. Dewey and Thomas E. Graves, who shall at once hear the parties and decide the same; and if they do not agree, Emory Washburn shall at once be associated with them; and the written award of either two of said arbitrators in the premises shall be final and conclusive.

And in case either of said persons named as arbitrators shall decease, or decline to serve, or from absence or other cause unable to do so, or it shall not be practicable to obtain his services, the parties hereto may agree upon some person in his stead, who shall have the same power and authority; but and if the parties do not and cannot or will not agree, then either party may apply to any judge of the Superior Court in Connecticut or in Massachusetts, who, on proper and reasonable notice to the parties hereto, is requested and empowered to appoint an arbitrator in the place and stead of such person or persons as may not serve for any of the causes aforesaid: and thereupon the arbitration shall proceed as if the above persons should or could serve.

The parties hereto mutually stipulate, each with the other, that all promises and agreements made to or by one party to the other party to this instrument shall extend to and operate for the benefit of the successors of the party to whom or for whose benefit such agreement or promise is made.

This indenture is made subject to the ratification and approval of the stockholders of said corporation parties hereto, at meetings lawfully called for such purpose.

checked them out by checks signed by himself as treasurer. The treasurer paid all bills contracted in the management and operation of the road, some upon his own motion and

IN WITNESS WHEREOF, the said several corporations have, by their presidents, thereto authorized, severally hereto set its signature and affixed its corporate seal in attestation thereof, this day and year first above written.

*Signed, sealed and delivered in presence of*

THOMAS E. GRAVES,

H. C. RICE,

*Witnesses to B. H. & E.*

H. C. RICE,

THOMAS E. GRAVES,

*Witnesses to N. & W.*

The Norwich & Worcester Railroad Company, by

A. F. SMITH, *President.*

Boston, Hartford & Erie R. R. Co., by

JOHN S. ELDRIDGE, *President.*

STATE OF CONNECTICUT, } ss.
COUNTY OF NEW LONDON. }

NORWICH, Feb. 9, 1869.

Then and there before me, John T. Wait, a notary public, duly commissioned and authorized by the Governor and under the laws of the State of Connecticut to take the acknowledgment and proof of deeds and other instruments in writing under seal, personally appeared the above-named Norwich & Worcester Railroad Company, by Alba F. Smith, their president, and acknowledged the foregoing instrument to be their and his free act and deed.

In witness whereof, I have hereunto set my hand and affixed my seal of office, at said Norwich, in said county of New London, on the day and year above written.

JOHN T. WAIT,
*Notary Public.*

STATE OF CONNECTICUT, } ss.
COUNTY OF NEW LONDON. }

NORWICH, Feb. 9, 1869.

Then and there before me, John T. Wait, a notary public, duly commissioned and authorized by the Governor and under the laws of the State of Connecticut, to take the acknowledgment and proof of deeds and other instruments in writing under seal, personally appeared the above named Boston, Hartford & Erie Railroad Company, by John S. Eldridge, their president, and acknowledged the foregoing instrument to be their and his free act and deed.

In witness whereof, I have hereunto set my hand and affixed my seal of office, at said Norwich, in said New London County, on the day and year above written.

JOHN T. WAIT,
*Notary Public.*

some upon vouchers certified by officers of the said New York and New England Railroad Company; he also made up the pay-rolls and paid all employees engaged in the management and operation of the defendant railroad, including the engineer and trainmen hereinafter referred to who caused the said injury.

" 8. All freight bills, tickets, and printed matter used in the operation of the defendant road were in the name of the New York and New England Railroad Company with the addition 'Norwich and Worcester Division,' and some of the cars in use and the engines used at the time of the injury hereinafter referred to were the property of the defendant, and had the name of the defendant painted upon them.

" 9. At said time the general superintendent of the said New York and New England Railroad Company was the managing agent, selected by the said New York and New England Railroad Company to take charge of the defendant's railroad under said lease, and was a person satisfactory to the defendant company. He chose officials who had the power of hiring and discharging all employees including the employees causing the said injury, and the defendant company had no control over these employees except in its approval of the choice of said managing agent.

" 10. The general charge and determination of what expenditures should be made to keep the railroad, bridges, equipment and supplies of the defendant in the condition equal to that when leased, and what additions should be made for increased business, was confided to a managing agent appointed by agreement by the boards of directors of both roads, and the treasurer of the defendant paid the expenses authorized by such manager for such purposes from the funds received by the treasurer from the income of the road and property. * * *

" 16. The injury to the plaintiff was caused wholly by the unskilled and reckless management and operation of the defendant's railroad in the manner above stated.

" 17. The engineer and trainmen in charge of and operating the engine and cars above described which caused said

accident, were employed as stated in paragraph 9 to work upon the defendant's railroad, and were paid by the treasurer as stated in paragraph 7.

"18. An action for the same cause of action was brought by this plaintiff against the New York and New England Railroad Company, and both causes were tried together by the court at the present session upon default and hearing in damages, and judgment was rendered for the plaintiff to recover of the New York and New England Railroad Company the sum of four thousand five hundred dollars, damages, and his costs of suit.

"19. Upon the foregoing facts the defendant admitted the negligence of the employees and the due care of the plaintiff and offered no evidence and made no claim in contradiction thereof, but asked the court upon the facts found to rule that the defendant was not liable for the injury complained of, and that nominal damages only should be assessed against this defendant; but the court refused so to rule and assessed substantial damages against the defendant, to wit: the sum of four thousand five hundred dollars."

The defendant appeals from the judgment of the Superior Court, on the sole ground that it is exempt from liability by reason of the indenture which exists between itself and the New York and New England Railroad Company, which is set out in the finding and which has received the legislative sanction.

The defendant in its brief says: "It is a general rule of law that a railroad corporation cannot by its own act, without the consent of the legislature, absolve itself of its public obligations, upon the principle that 'where a corporation like a railroad company has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions, which undertakes without the consent of the State, to transfer to others the rights and powers conferred by the charter and to relieve the grantee of the burden which the charter im-

poses, is a violation of the contract with the State, and is void as against public policy.' "

This is undoubtedly the law by all the authorities. The rule and the reason for it make the duty and the liability abide with the legal owner of the franchise. Thus, where a lease of a railroad is executed without legislative authority, the lessor remains liable for the *laches* and the neglect of the lessee, and may be sued therefor the same as though it was itself operating the road; the theory being in such cases that the lessee is the agent of the lessor. So, on the other hand, when the original grantee of a railroad franchise has, with the consent of the legislature, so transferred its property and its franchise to another that the transferee has become the legal owner thereof, then the obligations which grow out of and are the consideration for the franchise are transferred to the new owner. It is precisely as if the public grant had been made to the new possessor; for if the State through its legislature has assented to the transfer, the original grantee, in divesting itself of its property and of its right to operate a railroad, has also relieved itself of the obligations which are, for reasons of public policy, incident to and inseparable from the lawful exercise of the right. To this effect are the authorities cited upon the brief of the defendant, as fully as are those cited by the plaintiff.

The question then in this case, and the only question, is whether or not the defendant has, with the consent and approval of the State, transferred the legal ownership of its franchise to the New York and New England R. R. Co.

The contract made between these parties received the approval of the legislature some months after it was executed, by the Act already referred to, which provides that: "Any railroad company in this State * * * may take a lease of the property and franchises of, or lease its property and franchises to, any such railroad company, * * * and all such leases * * * heretofore made are hereby ratified and confirmed." The legislature can, therefore, be held to have approved no more than the parties have expressed by that contract. So the question is narrowed to an examination of

the contract, to discover if therein the parties have transferred from the defendant to the New York and New England Railroad Company the ownership of the franchise with which the legislature had previously invested the defendant. There are in the contract no direct words indicating any such transfer; nor any words tending to show that the defendant expected to relieve itself from such duties and liabilities as its franchise imposed; nor that the New York and New England Railroad Company supposed it had become solely chargeable with such duties and liabilities. The contract is called a lease. In most of the provisions it is a lease, although in some of its features it seems more like a traffic arrangement than a lease. Like a lease, it does not purport to transfer the ownership, but only the right to use the property leased. The words of conveyance are "demise, lease, rent;" and the property "demised, leased and rented" is all and singular the railway of the defendant, with all the lands on which the railway is located, and all rights, easements, franchises and privileges in connection therewith, or which are appurtenant thereto, together with all the personal property of the defendant used or to be used upon or in connection with the leased railroad, etc., as set out therein at great length. The consideration is a fixed annual rental. There is a fixed term and a stipulation that all the leased property, real and personal, shall at all times during the lease be kept in good repair; that all or any of it worn out, lost, or destroyed, shall be replaced and the whole returned at the end of the term to the defendant, in as good condition as to value, as it was at the date of the lease. The ownership of the franchise is not transferred, nor is it attempted to be transferred, any more than is the ownership of the railroad itself. On the contrary many of the provisions in the lease indicate that the defendant did not intend to part with its own franchise or undertake to do so. It promises and agrees on its part to maintain its own organization and existence as a body corporate in due form of law; that it will elect a lawful board of directors, a president, secretary or clerk, and a treasurer, and that such treasurer shall be

satisfactory to the lessee, and shall employ proper and necessary clerks or assistants; and that it will do and perform all such acts, matters and things, as shall be proper and necessary to the due preservation of all the property, estate, rights, franchises and interests therein let and demised, as are needful to carry into effect the true effect and intent of the agreement; and promises to do all lawful corporate acts and things upon request of the lessee, to enable the lessee to make any addition to lands for the use of the demised railway, or to enable it to improve said railway or its curves, cuttings, embankments or lines of sight, or depot or other grounds; while the lessee on its part promises and agrees to do all those things required by law to be done by those operating a railroad, the not doing of which might impair or forfeit the franchise of the defendant.    The defendant preserves to itself an absolute control over all business done by the lessee upon the leased property, by requiring that the managing agent to be appointed by the lessee shall be a person satisfactory to itself; that its own treasurer shall collect all the moneys received from and the earnings of the leased property, and have possession of the same; from which he shall pay all the expenditures and dues incurred in respect to the property demised, all taxes, assessments and other liabilities, and shall, at the end of each six months, pay to himself for and on account of the defendant the semi-annual rent due by the terms of the contract, and the balance, if any, deliver over to the lessee, the said New York and New England Railroad Company.

We have examined this contract with all the care we were able to bestow, and have been able to come to no other conclusion than that the defendant did not intend to, and did not in fact, part with the legal ownership of its franchise by any stipulation contained therein, but purposely retained its franchise in its own ownership and under its own control. It is therefore not exempt from liability to the plaintiff.

A grant to a corporation of a right to lay out, construct and operate a railroad is the grant to the corporation of the capacity to exercise a portion of the powers of sovereignty

for the purpose of making pecuniary profit to itself. This is its franchise. Such grants are never made except at the request of the corporation. In return, the corporation is held to have promised to pay just damages to any person injured by any want of care in using the right so granted. As the grant is of a public right in which every one of the public is a sharer, so the promise is to each one of the public. A due regard for the public rights obviously requires that a corporation which has asked for and received such a grant shall not be absolved from its promises except by an Act of the legislature to that effect so distinct and unequivocal as not to be open to mistake. Nothing should be left to inference. In this case there is no such Act of the legislature.

There is no error.

In this opinion FENN and HAMERSLEY, Js., concurred; TORRANCE and HALL, Js., dissented.

TORRANCE, J. (dissenting). In the result reached by the majority of the court in this case, I cannot concur. That result is, that the defendant is liable for what was in fact the negligent conduct of another corporation. It is based on the conclusion that the lease of February, 1869, though "ratified and confirmed" by the legislature, does not so transfer the franchise of the defendant, as to absolve it from liability for the acts of the lessee. Although the lease was in fact made before there was any legislative permission to make it, the subsequent legislative ratification placed it, in legal effect, upon the same footing as if it had been made and entered into after such permission had been granted. Regarding the matter from this point of view, let us consider briefly the Act granting such permission, and the lease which was, in legal effect, made in pursuance of it.

The Act (Public Acts of 1869, Chap. 76) provides as follows: "Any railroad company in this State * * * may take a lease of the property and franchises of, or lease its property and franchises to," any other railroad company "with whose railroad its own railroad may connect or intersect. All

such leases and contracts heretofore made are hereby ratified and confirmed; provided that nothing in this Act shall be so construed as to authorize the merger or consolidation of the stock of any railroad companies."

By this Act the defendant was authorized to "lease its property and franchises" to the lessee for such a period of time and upon such terms as might be agreed upon by the parties. Authority to "lease its property and franchises" as here used, clearly gives the lessor the right to convey and transfer "its property and franchises" to the lessee for and during the term of the lease. What does the word "franchises" as used in this Act mean? The word "franchise" is often used as a generic name, descriptive of all the rights, privileges, and immunities contained in the charter, including the right of the corporation to become and to continue to be a legal person; but in a narrower sense it includes only the rights, powers and privileges conferred by the legislature upon the corporation as such, after it has come into existence as a legal person. The right to form a railroad corporation is a franchise which may be said to belong to the corporators; while the right to take land for railroad purposes, to operate the railroad, and to take tolls therefor, are properly called "franchises" which belong to the corporation. It is in this narrower sense that the word "franchises" is used in this Act, for it clearly contemplates the continued existence of the lessor, as a corporation, in the use of all its "franchises" not transferred by the lease, and ready to resume the exercise of all its franchises at the termination of the lease; and it is expressly forbidden to merge or consolidate its stock with that of the lessee. By this Act, then, the defendant was clearly authorized to transfer to the lessee for one hundred years, the right which it had under its charter to operate its then existing railroad, and its right to take tolls therefor, and any other "franchises" of a similar nature, which the lessor might see fit to transfer. It was not authorized to transfer or assign its "franchise," meaning by that its entire charter powers, either permanently or tempo-

rarily; it was only authorized to transfer temporarily its "franchises" in the narrower sense of the word franchise.

Such being the nature of the Act under which the lease was, in legal effect, made, let us look at the lease to see what it does transfer and convey to the lessee.

In the first place it begins by a recital which the legislature adopted, " that it is believed to be for the advantage of the public " that the railway and steamboat property of the defendant "should be managed and operated " by the lessee for the term of one hundred years. In the next place the lease by apt and appropriate words transfers to the lessee for the term of one hundred years, the then existing railway of the defendant, and all its visible, tangible property of every kind, real or personal, and all its "rights, easements, franchises and privileges, in connection therewith, or which are appurtenant thereto." It further provides as follows:—
" The business in connection with the leased property shall be managed and conducted as follows, to wit: The party of the second part shall fix and determine the number and time of all trains to run on the leased railway, to fix all rates of passenger and freight transportation, *employ* and *control all employees* in connection with the business, and have control of the business done or to be done, in connection with or on the leased property."

The legal effect of these provisions, unless they are controlled by other provisions of the lease, is to transfer to the lessee for one hundred years, the exclusive right to use all the railroad property of the defendant for railroad purposes; the exclusive right to operate, use, and control that property as a railway; and the exclusive right to hire, discharge, and control the persons who should be engaged in its operation and management.

But the only other provisions which can by any possibility be claimed to control the legal effect of those already considered, are the following: First, the lessor is to appoint a treasurer satisfactory to the lessee, who is to receive as they accrue all earnings of the road, and pay all such expenditures as he knows to be correct and such others as are

ordered or approved by the lessee's managing agent, and semi-annually retain for the defendant the agreed rental, and turn over to the lessee the balance; second, the provisions in the lease respecting indemnity to the lessor for defaults or failures of the lessee in the operation and management of the railway, or in the use of the leased property; third and last, the provisions in relation to the appointment of a managing agent.

The provisions relating to the appointment and duties of the treasurer, are evidently put in as a method for securing the payment of the rent, and nothing more; they have no reference to the actual management and operation of the railway, or the hiring or discharge of employees, which are elsewhere provided for.

The provisions for indemnity were evidently put in as a matter of caution, to cover cases where a duty still rested upon the defendant which the lessee had engaged to perform.

As to the managing agent the lease provides as follows: "It is mutually agreed that the general charge and determination of what expenditures shall be made to keep the railway bridges, buildings, equipment, and supplies of the party of the first part equal to the present condition of the same, and what additions thereto may be required by the increased business of the road, shall be confided to a managing agent, to be agreed upon by the board of directors of the two companies," or, in default of such agreement, by certain arbitrators. This agent is to be removed on request of either of the parties. The duties of this agent relate solely to the preservation and protection of the reversionary interests of the lessor, and to the protection of the lessee upon its covenants with reference to such reversionary interests, and have nothing to do with the hire or discharge of servants and agents, or the actual operation of the railway in the running of trains.

The lease further provides that the lessee " shall have a person in charge of the railroad and property, to be called the managing agent, who shall be a person satisfactory "

to the lessor.    This agent is appointed solely by the lessee, and at the time of the injury to the plaintiff this position was filled by its general superintendent.    As stated in the finding: " He chose officials who had the power of hiring and discharging all employees, including the employees causing said injury, and the defendant company had no control over these employees except in its approval of the choice of said managing agent."    This managing agent was in no legal sense the agent or appointee of the lessor, any more than the treasurer of the lessor was the agent or appointee of the lessee.    The fact that such agent was to be " satisfactory " to the lessor, gave it no control over the hire and discharge of the lessee's employees, or the running of trains upon the leased railway; for the exclusive control of these matters is expressly given to the lessee, in the lease, just before the provision for the existence of this managing agent.

These provisions, then, whether singly or combined, do not affect or control the legal effect of the provisions heretofore considered; and so the lease must be regarded as transferring to the lessee for one hundred years the exclusive right to operate this railway, and the exclusive right to hire and discharge and control the persons who from time to time are engaged in operating it.    This being done with the legislative consent, with what propriety can the defendant be held liable for the acts of persons over whom it had and has no sort of control?    The liability of a person for acts legally hurtful to another, is based, usually, upon his power to prevent or control such acts, or upon his power and control over the person who does them ; and where there is no such power of prevention or control there can be, as a rule, no liability.

In the case at bar as the defendant had no power or control over the lessee or its employees who did the act complained of, I think it ought not to be held liable for the results of that act.

In this opinion HALL, J., concurred.